BY THE

## ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## OCTOBER TERM, 1914.

---

JESSE L. SMITH, Respondent, v. THE CHICAGO ROCK ISLAND AND PACIFIC RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, October 5, 1914.

1. COMMON CARRIERS: Damages: Delay in Shipment: Evidence. Plaintiff sued for damages arising from the spoiling of a shipment of dressed turkeys caused, as he alleged, by a delay in shipment. Evidence examined and *held* sufficient to go to the jury upon the questions of negligent delay and whether negligent delay spoiled the turkeys and the amount of damage arising therefrom.

2. PLEADING: Petition: Failure to Deliver. Where a petition charged that the damages arose from a negligent delay in shipment whereby turkeys were spoiled, this did not include an item of damages for failure to deliver certain turkeys, and therefore evidence that the car was broken into and robbed in transit was not admissible.

3. INSTRUCTIONS: Separate Elements of Damages Specified in Petition. Where separate elements of damages are specified,

it is error to submit an instruction permitting the jury to assess the damages for such various items without limiting, in the instruction, the amount which could be recovered on each element to the amount charged in the petition.

Appeal from Jackson Circuit Court.—*Hon. Kimbrough Stone,* Judge.

REVERSED AND REMANDED.

*Sebree, Conrad & Wendorff* and *Paul E. Walker* for appellant.

*Glen R. Donaldson* for respondent.

TRIMBLE, J.—This is an action to recover $1497.60 as damages sustained in the shipment of certain perishable freight, consisting of dressed turkeys, from Pleasant Hill, Missouri, to Armour & Co. in Kansas City, Kansas. Of said amount, $1437.18 was specified in the petition as having been lost by reason of negligent delay in transportation, $52.42 was for overcharge in freight and $8 was for expenses in looking after shipment, necessarily incurred and caused by the delay.

These various items thus specified in the petition aggregate the sum sued for, to-wit, $1497.60, and are particularly set forth here because they show that the petition did not declare upon a fourth item of damages, namely, a loss of 326 pounds of turkeys which were never delivered because the car was broken into and robbed while in transit.

A controversy exists between plaintiff and defendant as to whether the petition covers a failure to deliver by reason of loss of turkeys in transit. The petition alleges that the car was loaded with 20,569 pounds of No. 1 dressed turkeys of the value of fourteen cents per pound, 696 pounds of "Old Tom" turkeys at twelve cents, 528 pounds of No. 2 turkeys at

eleven cents and 71 pounds of "cull" turkeys at five cents per pound. The petition then goes on to allege that by reason of the negligent delay only 4006 pounds of No. 1 turkeys were in good condition, "and that all the balance of said turkeys delivered, to-wit, 17,532 pounds were in a green and spoiling condition." A careful arithmetical calculation of the various numbers of pounds stated in the petition will disclose that the number of pounds loaded into the car was 21,864, and when 17,532 pounds are deducted therefrom, there are still 326 pounds unaccounted for. Plaintiff contends that, because of this, the petition includes damages for failure to deliver the 326 pounds. This contention cannot be sustained. The petition contained no allegation that the defendant lost, or failed to deliver, any turkeys. On the contrary, it alleges that the loss of $1437.18 was "a loss and damage to plaintiff *through said delay,*" and this loss occasioned by delay was everywhere in the petition alleged to be by reason of the turkeys spoiling. Section 1794, Revised Statutes 1909, requires the petition to contain "a *plain* and concise statement of the facts." The petition did not cover this item of damages.

The greater portion of the turkeys, all but 4000 pounds, was purchased by plaintiff of a Mr. Shelton at Windsor, Missouri. The latter loaded his turkeys for plaintiff into the car at that point and the car was billed from there to Kansas City with directions to stop at Pleasant Hill where plaintiff would finish loading it with turkeys from his poultry house.

Windsor is a station on defendant's line about forty miles from Pleasant Hill, and the latter is an intermediate point between Windsor and Kansas City, being from thirty-four to forty miles distant from the said city. The time ordinarily required to make the run from Pleasant Hill to Kansas City was three or four hours. A local freight ran every day leaving Pleasant Hill at any hour between 3 p. m. and dark

and would arrive in Kansas City in time to deliver freight the next morning.

Plaintiff did not attend to the loading of the turkeys at Windsor. He loaded only the 4000 pounds put on the car at Pleasant Hill. When the car reached this point plaintiff opened six· or eight barrels of the Shelton turkeys therein and found them to be in good condition but did not examine the rest of them. When the car was finally delivered to Armour & Co. it was found that 4006 pounds of turkeys were still good notwithstanding the delay. This practically corresponds with the number of pounds plaintiff loaded at Pleasant Hill.

Defendant urges that its demurrer to the evidence should have been sustained. This view rests upon the claim that there is no testimony as to the number of turkeys loaded at Windsor, nor their condition at that time, nor how they had been treated prior to that time; and since the number of pounds of good turkeys at the end of the journey is the same, or practically so, as those loaded by plaintiff himself at Pleasant Hill, defendant contends that the spoiling of the turkeys must have been in those loaded at Windsor, and that the evidence did not show the turkeys were spoiled by the alleged negligent delay. It is no doubt true that in order for plaintiff to make out a case for negligent delay he must, in addition to such delay, show that the shipment was in good condition when delivered to defendant and that it was in bad condition when delivered to Armour & Co. But we cannot agree with defendant that there was no substantial evidence of these facts sufficient to enable plaintiff to go to the jury.

As to the number of pounds loaded at Windsor, there was ample evidence to show that. Plaintiff put in 4000 pounds at Pleasant Hill. He saw one-third of the car weighed at Armour's. He was an experienced poultry dealer. He showed the number of pounds of good turkeys sold out of the car and the

number of pounds of spoiled turkeys sold and for which he received the money. The bill of lading specified a larger number of pounds than he claimed, and defendant's correspondence showed this excess in weight, above what plaintiff claimed, to be an error in the bill. This was sufficient to show the number of pounds put in the car at Windsor.

The car was set on the loading track at Windsor at 7 a. m. Saturday, December 14th. Mr. Shelton loaded the car between that hour and 1 p. m. of that day, for the car left Windsor for Pleasant Hill at that time. It arrived at Pleasant Hill the same afternoon about three or four o'clock. Plaintiff immediately had the car iced and then examined the turkeys to see what condition they were in. He opened six or eight barrels "skipping around over the car" and took out half of the turkeys in each barrel and looked them over carefully. They were properly packed and in first-class condition. This would tend to show they were properly treated and cooled before putting them into the car at Windsor since they had not been in long enough to have hidden that fact from plaintiff. If they had been put in warm they would have still showed it to an experienced poultry man. The barrels held from twelve to twenty-four turkeys, so that plaintiff must have examined at random somewhere between thirty-six and ninety-six turkeys in the car. He also found the temperature of the car was good. When the shipment was examined at Armour's it was found that about as many, in proportion, of the turkeys loaded at Pleasant Hill were spoiled as were those of the Windsor turkeys. There were good and bad ones in both. The good ones were found here and there throughout the car in the same ratio, whether in those first or last loaded. When the turkeys were examined at Armour's they disclosed symptoms of spoiling different from those manifested when turkeys are packed before being properly cooled. Plaintiff examined much more

than one-third of the car by opening the barrels and noting the spoiled condition, although he did not see but one-third of them weighed. All this was evidence from which the jury could find that the spoiling of the turkeys was not because of their treatment or condition when they were loaded at Windsor. Of course, plaintiff would have had still stronger proof had he put Shelton on the stand and showed by him, or whoever treated and loaded the turkeys, that they were in good condition. But we cannot say plaintiff had no evidence upon that point.

There was evidence tending to show negligent delay both at Pleasant Hill after the car was loaded, and also after it reached the yards in Kansas City and before it was delivered at Armour's; also that during this delay of one day while the car was in the yards, it was broken into and robbed. Plaintiff's evidence tended to show that the loading of the car was finished about one o'clock Sunday, December 15, and that it could have gone out on the regular freight that afternoon but the agent failed to have it sent out and that it remained where loaded until Monday afternoon, and should have been delivered to Armour's ready to unload on Tuesday morning. There was evidence to the further effect that the car was turned over to defendant's switching agent in Kansas City at 4:15 Tuesday morning, and that after this was done the car remained in the yards for a day during which time it was robbed. The switching and transferring of the car to Armour's plant was done in the night; defendant introduced no evidence to show when its agent delivered the car to Armour's, but did offer proof that the car was setting there Wednesday morning and not yet unloaded. About 2:30 that afternoon Armour & Co. notified plaintiff that they wanted him to see the condition of the turkeys, and he came to Kansas City on the same afternoon and examined the turkeys. Armour & Co. also notified the railroad com-

pany that the car had been tampered with. The reasonable inference which the jury could draw from all this was that the car was delivered to Armour & Co. sometime Wednesday morning, December 18th, after having been in transit from Pleasant Hill ever since Saturday afternoon, December 14, a lapse of almost four days when the ordinary and usual time for shipment is a few hours.

It is argued that there is no evidence to show what caused the turkeys to spoil, or rather that there is no evidence to show that the delay caused it. Plaintiff on Saturday afternoon iced the car thinking it would be delivered Monday morning. It is true he says he put in enough ice to keep the turkeys till Tuesday morning if the car had been kept closed. But this does not show, as matter of law, that the delay did not cause the turkeys to spoil, even though the evidence does not show that the car was broken into prior to 4:15 a. m. Tuesday morning. Had the car gone as plaintiff claims it should it would have arrived at destination Monday morning. Instead of this it did not arrive until some time Wednesday morning the eighteenth. The testimony showed that the weather was damp and heavy, that turkeys would spoil a great deal quicker if the air gets to them in such weather than in dry weather; that the condition of the atmosphere has a good deal to do with the keeping or spoiling of turkeys, unless the temperature is below freezing; that the parts of the turkeys exposed to the air were found to be "sweaty, sticky and like rubber" and had "struck green." During the 17th of December, the government records showed, the humidity or amount of water in the atmosphere was ninety-three per cent in the morning and in the evening 100 per cent or at the saturation point. These records also showed that the lowest temperature on the fifteenth was thirty-three degrees and the highest forty, on the sixteenth the lowest was twenty-nine and the highest

forty-nine, on the seventeenth the lowest was twenty-
seven and the highest thirty-four. These records did
not show how long either extreme of these tempera-
tures prevailed, so is was not shown that during the
seventeenth and part of the eighteenth the tempera-
ture was such that the turkeys would not spoil. Un-
der all the circumstances the question whether the
delay caused the turkeys to spoil was a question for
the jury to settle.

Nor is there a total absence of evidence as to the
number of pounds of turkeys spoiled. Plaintiff saw
one-third of the shipment weighed, examined a large
portion of the remainder by opening the barrels and
noting the spoiled condition, and knew how the pro-
portion of good turkeys was running as compared with
the bad. Upon comparing the invoices of the various
grades of turkeys sold, plaintiff's experience in the
business together with his knowledge of the way they
ran while being weighed and examined in his presence
would enable him to testify, as he did, to the number
of pounds of bad turkeys. This was sufficient to con-
stitute some evidence of the amount of good and bad
turkeys in the shipment. The invoices were admissible
to show the number of pounds he was enabled to sell
at each price. Of course, without plaintiff's evidence
as to the way the turkeys averaged, the invoices would
not be evidence as to how many were actually spoiled
unless they were supported by the evidence of some
one who knew the invoices were correct.

From what has been said it can be seen that there
was not a total failure of proof. The evidence in
support of plaintiff's case would have been much
stronger and more definite had testimony been offered,
if obtainable, by those who loaded the turkeys at Wind-
sor as to their condition and prior treatment, and also
testimony from those who unloaded and weighed the
shipment as to the precise number of pounds of good
and bad turkeys. We cannot say, however, that the

proof was so lacking or indefinite in character as to amount to no proof and thereby justify an outright reversal of the case.

Over the objection of defendant plaintiff offered proof of the loss of turkeys of which the car was robbed and which consequently never were delivered. This was error, since, as we have seen, the petition did not cover this item of damage.

Plaintiff's instruction on the measure of damages did not in fact tell the jury what that measure was but merely told the jury that if they found for plaintiff they should assess his damages at such sum as would reasonably compensate him for the damages sustained not to exceed, however, the sum of $1466.17. The measure of damages sustained by reason of negligent delay is the difference between the reasonable market value of the turkeys at destination in the condition they would have been in had they been delivered in a reasonable time after shipment and their market value in the condition in which they were at the time when they did arrive. Of course, if there was a provision in the bill of lading that if goods were lost in transit their value at point of shipment should govern, then another measure of damages would apply as to goods not delivered. Plaintiff had but the one instruction, and under such circumstances it is a very serious question whether the instruction did not allow the jury to find for plaintiff without passing on the question of negligent delay or the question whether the delay caused the turkeys to spoil. But, however this may be, it did not tell the jury what was the measure which the law required them to apply in ascertaining the damages. Even if it is plain from the petition what the loss is that plaintiff seeks to recover, the jury should be told what the measure of damages should be. [Pannell v. Allen, 160 Mo. App. 714, l. c. 722.] The instruction, however, did nothing

more than limit the total amount plaintiff could recover.

The instruction also permitted the jury to allow for turkeys lost in transit when the petition did not cover them.

Plaintiff was seeking to recover four elements or items of damages, first for negligent delay, second for overcharges in freight, third expense in coming to Kansas City to look after the shipment, and fourth for failure to deliver, and the amount asked for each was specified and limited in the petition. In fact, these constituted at least two, and possibly more, different causes of action. In such case an instruction authorizing, and a verdict returned for, a lump sum is erroneous and the latter cannot stand. [Pitts v. Fugate, 41 Mo. 405; Flowers v. Smith, 214 Mo. 98, l. c. 141; McHugh v. St. Louis Transit Co., 190 Mo. 85, l. c. 93.] Where the suit is upon one cause of action but separate elements of plaintiff's damages are specified it is error to submit an instruction permitting the jury to assess the damages for such various items without limiting, in the instruction, the amount which could be recovered on each element to the amount charged in the petition. [Smoot v. Kansas City, 194 Mo. 513, l. c. 522; Blyston-Spencer v. United Railways Co., 152 Mo. App. 118, l. c. 140; Tinkle v. St. Louis & San Francisco R. Co., 212 Mo. 445, l. c. 471; Smart v. Wabash R. Co., 164 Mo. App. 61.]

The petition alleged facts which made the shipment an interstate one and the evidence showed this to be the case. One of the items of damage alleged was $52.42 for over-charge in freight. This was based partly on an overcharge in *rate*. The court refused to allow any evidence as to overcharge in rate, or rather held that the proper rate could not be proved except by introducing copies of the rates on file with the Interstate Commerce Commission. There was no evidence then as to the overcharge in *rate*.

The instruction on measure of damages limited the whole amount of recovery to $1466.17 which was $31.43 less than the amount sued for, which reduction was evidently made to eliminate the overcharge as to rate. But in the instruction there was no way for the jury to know that they could not allow the full amount asked for on account of overcharge.

Again, the jury, under the instruction given, were authorized to allow plaintiff the $8 he alleged in his petition he expended in looking after the delayed shipment, when there was evidence that he was compelled to come to Kansas City for that purpose but no evidence as to what he expended.

Other errors are complained of but they are either included in the foregoing or else are not necessary to pass upon since the case must be reversed and remanded for a new trial for the errors already noted.

The judgment is accordingly reversed and the cause is remanded for a new trial. The other judges concur.